**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-4055
_____

KAREN V. CAPPUCCIO,

Appellant

v.

PRIME CAPITAL FUNDING LLC; KIRK AYZENBERG;
AMERICA'S WHOLESALE LENDER; COUNTRYWIDE
BANK, NA; COUNTRYWIDE HOME LOANS
SERVICING, L.P.; FIRST MAGNUS FINANCIAL
CORPORATION; HOMECOMINGS FINANCIAL, L.L.C. a
GMAC Company; MAK ABSTRACT; E*TRADE, d/b/a
E*Trade Financial Corporate Services, Inc., d/b/a E*Trade
Mortgage Corporation

_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(No. 07-cv-04627)
District Judge: Honorable Juan R. Sánchez

1

Argued May 24, 2011

Before: FUENTES, FISHER, and NYGAARD, <u>Circuit Judges</u>

(Opinion Filed: August 16, 2011)

Cary L Flitter, Esq.
Theodore E. Lorenz, Esq. [ARGUED]
Andrew M. Milz, Esq.
Lundy, Flitter, Beldecos & Berger, P.C.
450 North Narberth Avenue
Narberth, PA 19072

    *Counsel for Appellant*

Joseph F. Riga, Esq. [ARGUED]
McDowell Riga, P.C.
842 West Lancaster Avenue, Second Floor
Bryn Mawr, PA 19010

    *Counsel for Appellee*

---

OPINION OF THE COURT

---

FUENTES, <u>Circuit Judge</u>:

Appellant Karen Cappuccio appeals an unfavorable jury verdict on her complaint under the Truth In Lending Act ("TILA"), 15 U.S.C § 1601 *et seq*., against Appellee E*Trade

2

for its failure to properly notify her of her right to cancel her home mortgage. Cappuccio challenges various aspects of the jury instructions, including the District Court's directive that because her signature was on the notice of right to cancel, "something more than just [her] testimony . . . is needed to rebut the presumption that she received" the notice. Because we find no basis in TILA or the Federal Rules of Evidence for this portion of the instruction, and because we do not find the error to be harmless, we will vacate the verdict and remand for a new trial on her rescission claim.

## I.

### A. Background

In 2006, Appellant Karen Cappuccio sought to refinance the mortgages on her home in Hellertown, Pennsylvania, while interest rates were low. She had two existing mortgages on her home: a 30-year 6.38% fixed-interest loan and a 30-year 11.2% fixed-interest loan. Cappuccio hoped to combine these two loans into a single mortgage with a lower monthly payment and interest rate, while receiving an additional $20,000 to $25,000 with which to make home improvements. Later, at trial, Cappuccio sought to introduce evidence that she had specifically sought a 30-year 5% fixed-interest mortgage in the amount of approximately $165,000, but was precluded from doing so by an evidentiary ruling of the District Court.

While exploring the options for refinancing, Cappuccio responded to an advertisement on the internet by providing information about her existing mortgages as well as the type of refinancing she was interested in obtaining.

3

Shortly thereafter, she received a phone call from an individual named Kirk Ayzenberg, who was a loan agent for a brokerage firm called Prime Capital Funding LLC ("Prime Capital"). Ayzenberg told Cappuccio that he had received her information and could help her obtain the kind of loan she was interested in. Shortly after, Prime Capital submitted a Universal Residential Loan Application on behalf of Cappuccio to lender Countrywide Bank, NA for both a 30-year 5% fixed-interest loan and a 30-year 4.75% fixed-interest loan. Prime Capital also submitted a loan application on behalf of Cappuccio to lender First Magnus Financial ("First Magnus") for a 20-year 11.5% fixed-interest loan. Cappuccio later testified that she did not want two separate mortgages on her home and that Prime Capital did not tell her that it was submitting applications for two different loans.

After receiving Cappuccio's loan application, Countrywide generated a new application which resulted in an offer of a 30-year adjustable, "negative amortizing loan"[1] with a 9.95% interest rate ceiling and an initial one month "teaser" rate of 4.75%. Countrywide did not inform Cappuccio that it was not processing the original loan applications, nor that it was offering her a more complex and expensive mortgage. First Magnus Financial rejected the application it was sent by Prime Capital and instead it provided Cappuccio with a 15-year 13.477% interest loan that

---

[1] A "negative amortizing loan" is a loan where payments made during the first few years of the mortgage are less than the interest accrued by the borrower, thus increasing the size of the principal beyond its original amount. James Charles Smith, *The Structural Causes of Mortgage Fraud*, 60 Syracuse L. Rev. 473, 495 (2010).

included a $40,727 "balloon" payment due at the time of the last loan payment. First Magnus did not notify Cappuccio of the differences between the loan it offered her and the loan for which she had applied.

The lenders, Countrywide and First Magnus, hired MAK Abstract as the title agent to close Cappuccio's loans. MAK Abstract then hired Maureen Krajczar, a notary in Bethlehem, Pennsylvania, to act as the closing agent. Ayzenberg told Cappuccio that she would meet with Krajczar on the evening of November 3, 2006, at Krajczar's house, in order to go through all of the paperwork for the closing. Cappuccio testified that she and Krajczar sat at Krajczar's kitchen table, alone together, as Krajczar passed Cappuccio various documents one at a time, directed her attention to the signature page, asked Cappuccio to "sign, date here, sign, date here, sign, date here" for each, before taking the documents away. (App. 270-71). Cappuccio testified that the process felt rushed and very hasty, and that Krajczar never explained any of the documents to her. She further testified that when she asked Krajczar questions, Krajczar stated that she had to remain neutral and therefore could not answer them. Cappuccio acknowledged at trial that she signed a Notice of Right to Cancel (hereinafter a "notice") for each loan on the night of the closing, but testified that she did not understand what they meant or signified at the time she signed them.

The notices stated:

**YOUR RIGHT TO CANCEL:**
You are entering a transaction that will result in a mortgage, lien or security interest on/in your

5

home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is **NOVEMBER 3, 2006**; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

…

If you cancel by mail or telegram, you must send a notice no later than midnight of **NOVEMBER 07, 2006** (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

…

ACKNOWLEDGMENT OF RECEIPT

BY SIGNING BELOW, I, THE UNDERSIGNED, HEREBY ACKNOWLEDGE THAT ON THE DATE LISTED ABOVE I RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME OF MY RIGHT TO CANCEL THIS TRANSACTION.

(App. 62-63).

Cappuccio testified that about 40 minutes after she arrived, having completed all of the paperwork, she left Krajczar's house without any documents from the closing in her possession. Krajczar could not recall any of the details of Cappuccio's closing, but testified that in accordance with her normal practices and Countrywide's policy, she is confident she would have given Cappuccio the correct number of copies of the notices and Truth in Lending statement to take with her from the closing. Krajczar also testified that, typically, a closing like Cappuccio's that involved two loans would take an hour and a half to two hours.

According to Cappuccio, by November 8, when the loan proceeds were disbursed, she had not yet received copies of the notices or Truth in Lending statements. She testified that a UPS package from MAK Abstract arrived the next day, November 9, containing a $14,000 check, loan documents, a single copy of the notice, and a Truth in Lending statement for the Countrywide loan. Cappuccio observed that the terms of the loan listed were not what she expected. She also saw the bolded date, "November 07, 2006," which she incorrectly read as the last day for her to rescind her loan. She therefore believed it was too late to cancel the loan.

Cappuccio further testified that two copies of the notice and a Truth in Lending statement for the First Magnus loan arrived in a UPS package on November 14. She stated that an additional $2,000 check came in a separate envelope. Cappuccio again mistakenly believed that she could no longer rescind the loan because November 7 had passed. In contrast, Michael Kuldiner, owner of MAK Abstract, testified that the

7

two UPS packages they sent to Cappuccio each contained only one check, no notices or other loan documents, and that he has never sent loan documents to borrowers in the manner Cappuccio described.

On August 15, 2007, Cappuccio, through her counsel, sought to rescind both loans. Countrywide and E*Trade Bank, the assignee of the First Magnus loan, both refused to honor her claimed rescission or make restitution. Cappuccio then filed suit.

### B. The trial

Cappuccio brought claims against the lenders, Countrywide and First Magnus, for (1) damages, rescission, and injunctive relief under TILA; (2) common law fraud; (3) statutory fraud under the Pennsylvania Unfair Trade Practices Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2; and (4) violations of the adverse action notice requirement of the U.S. Equal Opportunity Act ("EOA"), 15 U.S.C. § 1691. Cappuccio also brought claims for damages, rescission, and injunctive relief under TILA against Appellee E*Trade, the assignee, and Homecoming Financial LLC, the servicer of the First Magnus loan (hereinafter jointly referred to as "E*Trade").[2] Finally, Cappuccio brought claims for statutory

---

[2] While Appellee argues in footnote 2 of its opposition brief that Homecoming Financial, as servicer, is not liable under 15 U.S.C. § 1641(f) of TILA, it does not cite to any place in the record, other than the pleadings, where this contention was raised before the District Court. Accordingly, we leave this issue for the parties and the District Court to resolve upon remand.

fraud under the UTPCPL against the title agent, MAK Abstract, the broker, Prime Capital, and the loan agent, Kirk Ayzenberg, as well as common law fraud against the latter two.

A jury trial was held in September 2008. As to the fraud claims, the jury awarded Cappuccio a verdict in the amount of $40,000 against Countrywide for common law fraud and statutory fraud under the UTPCPL, as well as $50,000 (including $10,000 in punitive damages) for violations of the adverse action notice requirement of the EOA. Cappuccio did not bring those same fraud claims against E*Trade because it was only the assignee of the loan, not the original lender.

As to the TILA rescission claim, Cappuccio sought to prove that she did not receive the notices of her right cancel at the closing, and further, that to the extent she did receive the notices in the mail *after* the closing, they were not clear and conspicuous because they listed the wrong final rescission date and because they were received only after the loan funds had been disbursed, thus triggering a three-year extension of her right to rescind the mortgages.

To determine whether the District Court erred when it instructed the jury that something more than just Cappuccio's testimony was needed to rebut the presumption that she received the notice, we set forth the verdict sheet the jury considered along with the instructions given by the District Court. As to the TILA rescission claim, the verdict sheet asked the jury the following questions:

> 1. Do you find by the preponderance

of the evidence that the First Magnus Defendants provided Ms. Cappuccio with two copies of the Notice of Right to Cancel *on* November 3, 2006, the date of the loan closing?

Answer: \_\_\_\_ Yes  \_\_\_\_ No

[If the answer to question 1 is yes, please STOP, you are finished with the TILA section]

2. Do you find by the preponderance of the evidence that the First Magnus Defendants provided Ms. Cappuccio with two copies of the Notice of Right to Cancel *after* November 3, 2006, the date of the loan closing?

Answer: \_\_\_\_ Yes  \_\_\_\_ No

[If the answer to question 2 is yes, please continue to question 3, if the answer to question 2 is no, please continue to [a question regarding statutory damages].]

3. If you find by a preponderance of the evidence that the First Magnus Defendants provided Ms. Cappuccio with two copies of the Notice of Right to Cancel after November 3, 2006, do you find by a preponderance of the evidence that the Notices would have clearly and conspicuously informed a reasonable consumer of his or her right to cancel the loans?

Answer: \_\_\_\_ Yes  \_\_\_\_ No

[If the answer to question 3 is yes, please STOP, you are finished with the TILA section]

(App. 52) (emphasis added).

Instruction 18 of the jury instructions directed the jury as follows with regard to question 1:

18. TILA Presumption

Where the borrower signs a document acknowledging that she received two copies of the Notice of Right to Cancel, a presumption that she actually did receive them arises. A presumption shifts the burden of proving a particular fact to the party opposing its existence. *In a TILA case, something more than just the testimony of the borrower is needed to rebut the presumption that she received two copies of the Notice.* In addition, the lender does not have to give the borrower two copies of the Notice at the closing. It can satisfy its obligations under TILA by mailing it to the borrower after the closing.

Since Plaintiff signed an acknowledgement that she received two copies of the Notice from both Countrywide and the First Magnus defendants on November 3, 2006, she is presumed to have received the copies.

(App. 17) (emphasis added).

The jury answered "yes" to question 1 on the verdict sheet, finding that Cappuccio had received the notices on November 3. As a result, the jury never reached questions 2 or 3, returning a verdict in favor of the lenders on the TILA claim. On March 13, 2009, the District Court, notwithstanding the verdict, dismissed all claims against Countrywide pursuant to a post-trial settlement it had reached with Cappuccio. That same day the District Court entered judgment in favor of E*Trade on the TILA rescission claim. Although on March 17, 2009, the District Court granted Cappuccio's motion for an entry of default judgment against the remaining defendants, Prime Capital, Ayzenberg, and MAK Abstract, and scheduled a hearing to determine damages, in October Cappuccio voluntarily dismissed her claims against those defendants, apparently to hasten her appeal against E*Trade.

## II.[3]

### A. The motion to dismiss the appeal.

As a threshold matter, E*Trade moves to dismiss Cappuccio's appeal. It argues that the District Court's issuance of a default judgment against Prime Capital, Ayzenberg, and MAK Abstract on March 13, 2009 resolved the last remaining claims in the case, and was therefore the Court's "final order," despite the fact that the District Court did not characterize it as such. E*Trade contends that this

---

[3] The District Court had jurisdiction over this matter under the Truth in Lending Act, 15 U.S.C. § 1640(e), as well as 28 U.S.C. § 1331. We have jurisdiction over Cappuccio's appeal pursuant to 28 U.S.C. § 1291.

makes Cappuccio's October 16, 2009 Notice of Appeal untimely under Federal Rule of Appellate Procedure 4(a)(1)(A), which permits 30 days to appeal a "final order."

The initial flaw in E*Trade's argument is that although judgment had been entered as to all claims and all defendants on March 13, 2009, there had been no determination of the amount of damages owed by each of the defaulting defendants. "We have previously recognized that, '[i]t is a well-established rule of appellate jurisdiction . . . that where liability has been decided but the extent of damage remains undetermined, there is no final order.'" *DeJohn v. Temple Univ.*, 537 F.3d 301, 307 (3d Cir. 2008) (quoting *Apex Fountain Sales, Inc. v. Kleinfeld*, 27 F.3d 931, 934-35 (3d Cir. 1994)). Here, because the District Court was still in the midst of determining the "extent of damage," Cappuccio argues there was no final order until October of 2009, when she voluntarily dismissed her claims against the defaulting defendants.

E*Trade responds by noting that Cappuccio sought damages from the defaulting defendants in the liquidated amount of $40,000, which the jury had awarded her on her UTPCPL claim against Countrywide. (Doc. # 108, 1). E*Trade argues that because the liability of the three defaulting defendants is joint and several with Countrywide, the remaining allocation of damages between those parties was a mere "ministerial" task of setting off from the $40,000 the amount that Countrywide had paid in its settlement and allocating the remainder to the defaulting defendants. E*Trade cites to *Hattersley v. Bolt*, 512 F.2d 209, 212-14 (3d Cir. 1975), where we held that regardless of the allocation of damages among defendants, when both liability and the *total*

13

amount of damages owed have been established for those defendants, "payment awaits only a future ministerial order, [and] finality is not lacking." *Id.* at 214.

We do not find *Hattersley* to be applicable, however, because the District Court here still had more than a ministerial task before it. Although the defaulting defendants argued at the damages hearing and in their subsequent filings that they were entitled to a "set off" from liability equal to the amount Cappuccio had already received in her settlement with Countrywide, Cappuccio disputed this contention in her opposition to the motion to strike the default judgments, arguing that the jury awarded her $40,000 in damages based on Countrywide's fraudulent actions alone, which were different from the actions that the defaulting defendants were alleged to have taken. (Doc. # 157, 11-12). While we need not determine which party would have prevailed on this question, the important point for purposes of finality is that the District Court had not yet ruled on this question of law and therefore, unlike *Hattersley*, it had more than a mere ministerial task before it. Even if E\*Trade were correct that Cappuccio's position as to the "set off" was clearly wrong, it is important that the finality of a judgment not rest on the parties' often subjective views of whether a still-outstanding damages issue is a close one, on the one hand, or easily resolved, on the other. The rule in *Hattersley* must be narrowly limited to those circumstances where the remaining task for the District Court is truly ministerial, in the sense of requiring no independent legal judgment. A broader rule would prove both impractical and unfair, forcing would-be appellants to make uncertain and risky determinations about whether a judgment is truly final. *See Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 132 (3d Cir. 2009)

14

("The finality requirement should be given a 'practical rather than a technical construction.'") (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 375 (1981)). Accordingly, *Hattersley* is not controlling here and there was no "final order" until October of 2009.[4] Cappuccio's appeal is timely.[5]

## B. The Truth in Lending Act

Congress expressly provided that the purposes of enacting TILA were "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him . . . and to protect the consumer against inaccurate and unfair credit . . . practices." 15 U.S.C. § 1601(a). We have paraphrased TILA's purpose by stating that "Congress enacted TILA to

---

[4]We also note that the District Court had dismissed Cappuccio's request for treble damages *without* prejudice, with leave to raise the issue again at the damages hearing, which had been partially completed and then adjourned. (Doc. # 152, 1). Thus, the treble damages issue had also not been finally resolved by the time of the October 13 voluntary dismissals.

[5] Both parties have moved for damages and costs pursuant to Federal Rule of Appellate Procedure 38. E*Trade argues that Cappuccio's appeal is frivolous because it was clearly untimely, and Cappuccio argues that E*Trade's motion to dismiss her appeal was frivolous because of longstanding precedent that a judgment is not final until damages have been determined. Because neither the appeal nor the motion to dismiss the appeal can fairly be characterized as frivolous, we deny both motions.

guard against the danger of unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing practices." *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 502 (3d Cir. 1998). Accordingly, because "TILA is a remedial statute and should be construed liberally in favor of the consumer." *Id.*

With certain exceptions not present here, TILA requires that a creditor in a consumer transaction disclose various items of information, including, among other things: (1) the identity of the creditor; (2) the "amount financed;" (3) the "finance charge;" (4) the "annual percentage rate;" (5) the sum of the amount financed and the finance charge, or "total of payments;" (6) the number, amount, and due dates or period of payments scheduled; (7) the "total sale price;" and (8) explanations and definitions of the foregoing terms. *See* 15 U.S.C. § 1638; 12 C.F.R. § 226.18.

In addition to the required disclosures, "TILA generally permits a consumer borrower to rescind a loan transaction that results in the creditor taking a security interest in the borrower's principal dwelling." *In re Porter*, 961 F.2d 1066, 1073 (3d Cir. 1992) (citing 15 U.S.C. § 1635(a)). The default three-day period during which the borrower may rescind the loan is intended to provide a "'cooling off' period during which . . . consumers [can] change their minds . . . ." *Id.* at 1068 (citing 15 U.S.C. § 1635(a)). "The creditor must 'clearly and conspicuously disclose' the borrower's rescission rights and provide forms for the borrowers to do so, in accordance with regulations promulgated by the [Federal Reserve] Board." *Id.* at 1073 (citing § 1635(a)). "The Board's regulations require lenders to deliver to borrowers two copies of a notice of the right to rescind, and the notice

must clearly and conspicuously disclose":

> (1) The retention or acquisition of a security interest in the consumer's principal dwelling.
> (2) The consumer's right to rescind the transaction.
> (3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's principal place of business.
> (4) The effects of rescission, as described in paragraph (d) of this section.
> (5) The date the rescission period expires.

*Id.* (citing 12 C.F.R. § 226.23(b)). This regulation, at 12 C.F.R. § 226.1 *et seq.*, is also known as "Regulation Z." *In re Cmty. Bank of North Va.*, 622 F.3d 275, 282 (3d Cir. 2010). "Under the statute and regulations, if the lender's notice is proper, the borrower's right to rescind lasts for three days[.]" *In re Porter*, 961 F.2d at 1073. The Official Staff Interpretations of Regulation Z, § 226.23, Supp. I, cmt. 23(b)(4), provides that the lender may deliver the notice after the transaction, but that if it does so, the rescission period of three days "will not begin to run until the notice is given." Further, "the rescission period extends to three years if the required notice and material disclosures (the annual percentage rate, [etc.]) are not delivered." *In re Porter,* 961 F.2d at 1073 (citing 12 C.F.R. § 226.23(a)(3) and 15 U.S.C. § 1635(f)). It is Cappuccio's primary contention that the lenders failed to timely provide her with compliant notices, thus triggering this three-year extension of the rescission period.

Finally, of relevance here, when a borrower signs a

"written acknowledgment of receipt" of the aforementioned disclosures required by TILA, his or her signature "does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. § 1635(c). This provision was the basis for the District Court's instruction to the jury that Cappuccio was presumed to have received the notices and that something more than her testimony was necessary to rebut that presumption.

## C. The presumption of receipt

## 1. Whether the instruction was erroneous

Cappuccio argues that the District Court erred when it instructed the jury that "[i]n a TILA case, something more than just the testimony of the borrower is needed to rebut the presumption that she received two copies of the Notice." (App. 18).[6]

Federal Rule of Evidence 301 provides the default rule for rebutting a presumption in a civil case. Rule 301 states:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party

---

[6] "We exercise plenary review in determining 'whether the jury instructions stated the proper legal standard.'" *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir. 2006) (quoting *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995)).

the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

In other words, unless Congress or the Rules of Evidence provide otherwise, "a presumption in a civil case imposes the burden of production on the party against whom it is directed, but does not shift the burden of persuasion." *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 287 (3d Cir. 2006); *see also In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004) (same). Under this theory, called the "ThayerWigmore 'bursting bubble' theory of presumptions[,] . . . 'the introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue.'" *McCann*, 458 F.3d at 287-88 (quoting *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 829-30 (3d Cir. 1994)). "This view of Rule 301 is widely accepted." *Id.* at 288 (collecting cases and treatise sources). *But see* 21B *Wright, Miller & Kane*, Federal Practice and Procedure, § 5122.2 (disagreeing with the majority view).

Further, the quantum of evidence needed to "burst" the presumption's "bubble" under Rule 301 is also minimal, given that "the presumption's only effect is to require the party [contesting it] to produce enough evidence substantiating [the presumed fact's absence] to withstand a motion for summary judgment or judgment as a matter of law on the issue." *McCann*, 458 F.3d at 288. We have previously held that a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at

19

a material issue, is sufficient to defeat summary judgment or judgment as a matter of law. *See, e.g.*, *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161-63 (3d Cir. 2009). This remains true even if the affidavit is "self-serving" in the sense of supporting the affiant's own legal claim or interests. *Id.* Here, Cappuccio's testimony related directly to a material issue in her TILA claim: whether she received two copies of a notice of the right to rescind her First Magnus loan when she left Krajczar's house on the night of the closing. Her testimony was also obviously based on her personal knowledge and was in no way conclusory. Accordingly, under Rule 301, her testimony would appear to be sufficient to burst the presumption's bubble, leaving the decision of whether to credit her testimony, or that of E*Trade's witnesses, to the jury.

However, by its own terms, Rule of Evidence 301 states that it applies only where "not otherwise provided for by Act of Congress . . . ." Accordingly, E*Trade could support the District Court's presumption instruction if it could show that Congress "otherwise provided" for a stronger presumption than that provided for by default under Rule 301. Yet E*Trade cites to no language in TILA or any other act that would demonstrate Congress's intent to create a stronger presumption. Nor is there any such language in Regulation Z. To the contrary, Cappuccio convincingly argues that the language in § 1635(c), "does no more than create," indicates that the provision is intended to construct the weakest form of presumption possible. Further, Cappuccio argues that elsewhere in TILA, Congress used plain and unambiguous language to create stronger presumptions when it intended to do so. For instance, § 1641(b) provides that in determining whether an assignee has acquired an obligation under TILA,

20

"written acknowledgement of receipt by a person to whom a statement is required to be given pursuant to this subchapter shall be *conclusive proof* of the delivery thereof . . . ." (emphasis added). Cappuccio persuasively concludes that the words, "does no more than," indicate an intent to apply the normal presumption provided for by Rule of Evidence 301, and not something "more than" that.

In sum, because of the plain language of TILA, and the resulting conclusion that Congress did not intend something other than a Rule 301 presumption to apply, we hold that the testimony of a borrower alone is sufficient to overcome TILA's presumption of receipt.

## 2. Harmless error

E*Trade argues that even if the District Court erred in requiring something more than Cappuccio's testimony to rebut the presumption of receipt, that error was harmless, given that Cappuccio presented to the jury "something more than just [her] testimony" that she never received the notices on the night of the closing. Specifically, it references the November 14 overnight UPS envelope from First Magnus that Cappuccio alleges also contained the disclosure forms and notices that should have been given to her on the night of the closing, as well as Cappuccio's testimony before the jury that she received the notices in that envelope eleven days after the closing.

E*Trade's argument is unconvincing. First, the jury should have been permitted to weigh all of the evidence as it saw fit without any instruction as to the appropriate weight to be given to one piece or another. Yet because the jury was

21

instructed that Cappuccio's testimony about what she received on the night of the closing was not weighty enough by itself to rebut the presumption, it could reasonably also have understood the instruction to imply that the same testimony must carry little weight even when considered in tandem with the other favorable evidence in the case, including the physical UPS envelope and Cappuccio's own testimony that she received the notices in the mail on November 14. In other words, we think it quite possible that the instruction affected the jury's weighing of Cappuccio's testimony, whether the jury evaluated the testimony in isolation or in combination with other favorable evidence that was material to the issue of receipt. Thus, we find that the presence of additional evidence in Cappuccio's favor does not necessarily make the instruction any less prejudicial.

Furthermore, we believe the jury could have reasonably interpreted the instruction to refer not only to Cappuccio's testimony about the closing, but also to her testimony about what she received in the mail on November 14. After all, the language "something more than just the testimony of the borrower" logically encompasses Cappuccio's testimony about what she received in the mail on November 14. Thus, the jury could easily have interpreted the instruction to mean that *neither* Cappuccio's testimony about what she received on the night of the closing, *nor* her testimony about what she received in the mail days later, was sufficient to rebut the presumption of receipt.

Finally, we also reject E*Trade's position that had the correct instruction been given, the jury verdict would surely have been in its favor, given the weight of the evidence. The question of whether Cappuccio received the notices on the

night of the closing ultimately depends on whether the factfinder believes the testimony of Cappuccio or Krajczar, which in turn necessitates multiple subtle credibility determinations. For this Court, on appeal, to attempt to extrapolate or predict what the jury's credibility findings would have been under a proper instruction would be entirely speculative. Because "we cannot say that there is a high probability that the error did not affect the outcome of the case[,]" *Woodson v. Scott Paper Co.*, 109 F.3d 913, 931 (3d Cir. 1997), we conclude that the error was not harmless.

### D. Additional references to the presumption

Cappuccio further argues that the jury instruction was erroneous or confusing because the District Court repeatedly referred to a presumption that Cappuccio received the notices on November 3, despite the fact that the presumption should have been deemed to have "dropped out" of the case once she met her burden of production by testifying that she did not, in fact, receive the notices on November 3.

As explained above, we have previously held that "a presumption in a civil case imposes the burden of production on the party against whom it is directed, but does not shift the burden of persuasion." *McCann*, 458 F.3d at 287. "Under this theory, 'the introduction of evidence to rebut a presumption *destroys* that presumption, *leaving only that evidence and its inferences* to be judged against the competing evidence and its inferences to determine the ultimate question at issue.'" *Id.* at 288 (quoting *McKenna*, 32 F.3d at 830 (3d Cir. 1994)) (emphasis added); *see also*, 2 McCormick on Evid. § 344 (6th ed. 2009) ("The trial judge need only determine that the evidence introduced in rebuttal

23

is sufficient to support a finding contrary to the presumed fact. If that determination is made, certainly *there is no need to instruct the jury with regard to the presumption.*") (emphasis added).

Of course, as the plaintiff, Cappuccio still bears the underlying burden of persuasion in proving, by a preponderance of the evidence, that she did not receive the notices. And the jury may still consider and weigh as evidence the fact that the notices were signed by Cappuccio, as well as all "inferences properly drawn therefrom." *McCann*, 458 F.3d at 288 n.5 (internal quotation omitted). Cappuccio's burden of persuasion, however, which was explained to the jury elsewhere in the instructions, should not be supplemented by language about a presumption of non-receipt, which could potentially confuse the jury by implying that something more than a mere preponderance of the evidence was needed to prove non-receipt.

Indeed, as a matter of good practice, where a party has produced sufficient facts to rebut a Rule 301 presumption, and it drops out of the case, the District Court should avoid references to such a presumption in its instructions.[7]

---

[7] Cappuccio also objects to the District Court's ruling that the parol evidence rule prevented her from introducing evidence of representations and promises made to her about favorable loan terms that she never ultimately received. She argues on appeal that the modification of the terms—what she calls the "bait and switch"—was the lenders' motive for delaying delivery of the notices, which in turn was the factual basis of her TILA claim. However, in opposing the District Court's parol evidence ruling, it does not appear that Cappuccio's

24

**E. The completeness of the instructions**

Finally, Cappuccio argues that the District Court erred when it instructed the jury that the lenders could satisfy their obligations under TILA by mailing the notices to Cappuccio after the closing, without *also* instructing that: (1) if they did so, the three-day rescission period would not begin to run until the notices were received; (2) that the lenders must provide the correct date for the expiration of the right of rescission on the notice; and (3) that the lenders must delay disbursement of the funds until the rescission period has passed.

Here, however, Instruction 17 states that the "[n]otice must inform borrowers that they may cancel their loan within three business days of the loan closing *or the date on which they receive the Notice, whichever occurs later*." (App. 16) (emphasis added). This language adequately conveys the law as to the tolling of the rescission period. Further, Instruction 19 states that the "Notice of Right to Cancel must clearly and conspicuously disclose . . . [t]he date the rescission period expires." (App. 18). This adequately explains that the date the rescission period ends must be accurately displayed on the notice. Finally, we have previously held that while

---

counsel ever squarely raised the alleged relevance of the change in the loan terms for her TILA claim. Accordingly, upon retrial we leave it to Cappuccio to raise before the District Court her argument for why the modified loan terms are relevant to her TILA claim, and for the Court to determine, in the first instance, whether such evidence falls within the scope of the parol evidence rule.

disbursement of the funds prior to the rescission date is a violation of § 226.23(c), it is not a violation of § 226.23(b) and therefore does not trigger the three-year extension of the rescission period. *Smith* v. *Fidelity Consumer Discount Co.*, 898 F.2d 896, 904 (3d Cir. 1990) ("The two subsections, while adjacent in the C.F.R., are separate with a violation of only § 226.23(b) extending the rescissory period."). Accordingly, the failure to instruct the jury on the timing of the disbursement was not error, given that premature disbursement does not lead to a three-year extension of the rescission period, the basis of Cappuccio's rescission claim. As to these issues, the District Court did not misstate the law in its instructions or abuse its discretion.

## III.

For the foregoing reasons, we will vacate the judgment of the District Court and remand for further proceedings not inconsistent with this opinion.