**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1850
_____

NICHINO AMERICA, INC.,
                                        Appellant

v.

VALENT U.S.A. LLC
_____

On Appeal from the United States District Court for the
District of Delaware
(D.C. No. 1-20-cv-00704)
District Judge: Honorable Leonard P. Stark
_____

Argued March 22, 2022

Before: BIBAS, MATEY, and PHIPPS, *Circuit Judges*

(Filed: August 12, 2022)

Bradley L. Cohn **[Argued]**
Jacquelyn Prom
Belinda J. Scrimenti
Pattishall McAuliffe Newbury Hilliard & Geraldson
200 South Wacker Drive
Suite 2900
Chicago, IL 60606
    *Counsel for Appellee*

Eric R. Clendening
Flaster Greenberg
1810 Chapel Avenue West
Cherry Hill, NJ 08002

Jordan A. LaVine **[Argued]**
Flaster Greenberg
Suite 1050
1717 Arch Street
Suite 3300
Philadelphia, PA 19103
    *Counsel for Appellant*

_____

OPINION OF THE COURT
_____

**MATEY**, *Circuit Judge*.

Whether a federal court may issue an injunction against an allegedly infringing trademark can be a bit confusing. Responding, Congress passed the Trademark Modernization

Act of 2020 ("TMA").[1] Nichino America Inc. says the District Court misapplied the TMA when it denied its motion for a preliminary injunction against Valent USA LLC's allegedly infringing mark. Finding no reversible error in the District Court's careful application of its discretion, we will affirm. Along the way, we explain how district courts should apply the rebuttable presumption of irreparable harm created by the TMA.

## I.

### A.     The Marks

Nichino and Valent sell pesticides for farming. Since 2004, Nichino has offered a trademarked product known as "CENTAUR." Valent trademarked a competing product called "SENSTAR" in 2019, giving it a logo resembling CENTAUR's colors, fonts, and arrow artwork. Both pesticides are used in the same geographic areas against many of the same insects, and both are sold to farmers through distributors. But there are differences. SENSTAR comes as a liquid and uses a unique combination of two active chemicals. It costs $425 per gallon, and ships in cases containing four one-gallon containers. CENTAUR is manufactured as a solid and sold by the pallet, with each containing 622 pounds of pesticide packed into bags and cases, for $24 per pound. Yet the similarities were enough for Nichino to sue Valent for trademark infringement, and ask for a preliminary injunction against SENSTAR's launch. A suit that would become one of the first to apply the newly effective TMA.

---

[1] Pub. L. No. 116-260, H.R. 133, 116th Cong. subtit. B, §§ 221–26 (2020).

## B. District Court Proceedings

Nichino argued that Valent's use of the SENSTAR mark would create confusion among consumers, a necessary element in a trademark infringement claim. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Confusion, said Nichino, likely to harm its reputation and goodwill, warranting injunctive relief.[2] That is where the TMA enters, creating a rebuttable presumption of irreparable harm favoring a plaintiff who has shown a likelihood of success on the merits of an infringement claim.[3]

The District Court found Nichino narrowly demonstrated its infringement claim would likely succeed, though "there is not an abundance of evidence of likelihood of confusion" between the products. (App. at 176.) The District Court reached that conclusion by consulting the "*Lapp* factors," our nearly forty-year-old, ten-part, yet non-exhaustive inquiry that guides analysis of likely confusion. *See Interpace*

---

[2] Injunctions require the familiar showing of a likelihood of success on the merits, irreparable harm that outweighs the burden on the nonmoving party, and benefit to the public interest. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). These burdens are all borne by Nichino. *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

[3] In relevant part, the TMA states that plaintiffs seeking an injunction "shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order." Pub. L. No. 116-260 § 226(a).

4

*Corp. v. Lapp, Inc.*, 721 F.2d 460, 462–63 (3d Cir. 1983); *see also A & H Sportswear, Inc.*, 237 F.3d at 213 (prescribing use of the *Lapp* factors in all trademark cases).[4] Weighing and balancing, the District Court tallied a final score of five factors favoring Nichino, two neutral, and three "very important factors" (overall degree of similarity, consumers' purchasing habits, and Valent's intent in selecting the mark) in Valent's column. (App. at 161–76.) Bringing us to the TMA, which the District Court applied to presume Nichino would suffer irreparable harm without an injunction. But that presumption is rebuttable, and the District Court credited Valent's evidence of a sophisticated consumer class that makes careful purchases, and noted the lack of any evidence of actual consumer confusion. Closing the circle, the District Court found Nichino failed to proffer evidence that it would likely suffer irreparable

---

[4] The factors summarized in *Lapp* break into three categories. First, facts about the plaintiff's mark, including its distinctiveness. Second, facts about the defendant's actions, including whether the mark was adopted to intentionally compete, overlapping sales and marketing efforts, and how long the competing mark has been in the market without confusion. Third, facts about how consumers deal with both marks. Is there evidence of actual confusion, or do costs and other differences between the goods make confusion unlikely? *See Lapp*, 721 F.2d at 463–64 (holding that trial court adequately addressed "every relevant area of inquiry" without "formally apply[ing]" the factors when it made findings about "[t]he plaintiff's mark," how "the defendant markets its products," and "[f]inally and perhaps most important," what "customers in the [relevant] field would find [] natural or likely" about which company makes which product).

harm without immediate injunctive relief.[5] Finally, the District Court held that the balance of equities and public interest weigh against issuing a preliminary injunction.

For those reasons, the District Court denied the injunction, and Nichino appealed, challenging the Court's finding that Valent had rebutted the presumption of irreparable harm.[6] Finding no reversible error that disturbs the District Court's conclusion, we will affirm.[7]

**II.**

Nichino contends that the TMA precluded the District Court's decision about irreparable harm. But the District Court admirably navigated Congress' newly minted rebuttable presumption. While our discussion builds on the District Court's insights, we arrive at the same conclusion. Valent

---

[5] Here, the District Court appropriately cited Nichino's evidence of likely consumer confusion. Evidence of consumer confusion is relevant to both likelihood of success and irreparable harm, so the evidence that plaintiffs offer to show one will often also tend to show the other. *See Kos Pharms., Inc.*, 369 F.3d at 726 (highlighting the importance of consumer confusion to both inquiries).

[6] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and we have jurisdiction under 28 U.S.C. § 1292(a)(1).

[7] We review the District Court's factual findings for clear error, the legal conclusions de novo, and the decision whether to grant an injunction for abuse of discretion. *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 161 (3d Cir. 2018).

rebutted the presumption, and Nichino did not independently show irreparable harm.

## A.  Federal Rule of Evidence 301 Grounds the TMA

Like all laws, the TMA does not exist in isolation. It complements existing rules and standards and is informed by their established effect. One complement, Federal Rule of Evidence 301, aids our understanding of the best ordinary meaning of the TMA.[8] Rule 301 provides that, in all civil cases, absent specific statutory language to the contrary, "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption." Fed. R. Evid. 301. That allocation "does not shift the burden of persuasion, which remains on the party who had it originally." *Id.*[9] That

---

[8] Because Congress gave Federal Rules promulgated under the Rules Enabling Act, 28 U.S.C. § 2072, the status of laws of the United States, *see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398, 399 (2010), we interpret such Rules using the traditional tools of statutory interpretation to discover their ordinary meaning. *See, e.g.*, *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832–33 (3d Cir. 2020) (interpreting Federal Rule of Evidence 702 according to its text); *see also United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020) (explaining that courts interpret the Federal Rules using the "words' ordinary, contemporary, common meaning by looking at what they meant when . . . enacted") (citing *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 123 (1989)).

[9] The burden of production, Professor Wigmore explained, is the obligation "to come forward with . . . some evidence . . . sufficient" to show that disputed issues of fact

framework applies here because the TMA creates a rebuttable presumption without explaining how it applies. *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 320 (3d Cir. 2014) ("Federal Rule [of] Evidence 301 provides the default rule for how presumptions operate in federal civil cases."); *Cappuccio v. Prime Cap. Funding LLC*, 649 F.3d 180, 190 (3d Cir. 2011) (applying Rule 301 to the Truth in Lending Act, 15 U.S.C § 1601 et seq., after finding "no language . . . to create a stronger presumption").

Because Rule 301 shifts the evidentiary burden of production, but leaves the burden of persuasion unmoved, the task of courts applying the TMA is limited. Over-scrutinizing the persuasive value of evidence proffered on rebuttal would violate Rule 301 by shifting the burden of persuasion, not just the burden of production. *See Cappuccio*, 649 F.3d at 189. Instead, courts must ask only whether the rebuttal evidence is

---

exist. John Henry Wigmore, Wigmore on Evidence: Evidence in Trials at Common Law § 2491 (4th ed. 1985). Satisfying that burden shifts "the same duty [to] the other party," who must produce evidence on the other side of the issue. *Id.* § 2493. Throughout this shifting one thing never changes: the burden of persuasion, meaning the obligation to convince the fact-finder on the issue, always remains with the same party. *Id.*; *see also McCann*, 458 F.3d at 287 ("There are two distinct elements . . . the burden of going forward with proof (the burden of 'production') and the burden of persuading the trier of fact (the burden of 'persuasion').") (cleaned up); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (a Rule 301 "presumption shifts the burden of *production* to the defendant, [but] the ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff") (cleaned up).

8

enough to allow a reasonable factfinder to conclude that irreparable harm is unlikely.[10] With that guidance in hand, we sketch the steps for applying the TMA's rebuttable presumption.

**Step 1.** The TMA's rebuttable presumption requires courts considering a trademark injunction to assess the plaintiff's evidence only as it relates to a likelihood of success on the merits. Consulting the *Lapp* factors to analyze likelihood of confusion, but only to determine whether the infringement claim is likely to succeed. Anything more, including commenting on whether the proffered evidence of consumer confusion could show irreparable harm, veers impermissibly into the burden of persuasion controlled by Rule 301. If a court finds no likelihood of success on the merits, the inquiry ends and the injunction will be denied. *See, e.g.*, *Kos Pharms., Inc.*, 369 F.3d at 709; *NutraSweet Co. v. Vit-Mar Enters, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate.").

---

[10] That small quantum of evidence is all we have required to rebut Rule 301 presumptions. In *Cappuccio*, we held that a borrower's own testimony that her lender had not properly explained the right to cancel her home mortgage was enough to rebut the Truth in Lending Act's presumption that notice was received. 649 F.3d at 189–90. We held that such meager evidence as "a single, non-conclusory affidavit . . . based on personal knowledge" is enough "even if the affidavit is 'self-serving.'" *Id.* And in *McCann*, we applied the same standard to rebuttals of the common-law presumption in favor of established domicile, rejecting a more demanding "clear and convincing evidence" rebuttal standard. 458 F.3d at 287–88.

**Step 2.** If the plaintiff's evidence does establish likely trademark infringement, the TMA is triggered, and the burden of production shifts to the defendant to introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm. *See Cappuccio*, 649 F.3d at 189. But note again the sequence. So far, the court has not assessed any of the evidence for likely irreparable harm. Rather, the TMA's presumption means the court assumes irreparable harm, even if the plaintiff has proffered nothing in support. The focus trains on the defendant's evidence, and whether it is sufficient to rebut the TMA's presumption. A meaningful consideration of the facts, not a box-checking review of the *Lapp* factors, is key, aimed at determining whether the defendant's offering allows a reasonable conclusion that the consumer confusion shown by the plaintiff will not cause irreparable harm.

**Step 3.** If a defendant successfully rebuts the TMA's presumption by making this slight evidentiary showing, the presumption has no further effect. It has done its work and simply disappears like a bursting bubble. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 287–88 (3d Cir. 2006). So the burden of production returns to the plaintiff to point to evidence that irreparable harm is likely absent an injunction. *See id.* ("Under Fed. R. Evid. 301 . . . the introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue." (quoting *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 830 (3d Cir. 1994))). Here again, the evaluation outlined in *Lapp* may prove useful to

10

assess whether consumer confusion will lead to irreparable harm.[11]

**B.** **The District Court's Rebuttal Analysis Follows Rule 301**

The District Court's finding that Valent rebutted the TMA's presumption follows the TMA and tracks Rule 301. The District Court began by using the *Lapp* factors to assess likelihood of consumer confusion to determine Nichino's likelihood of success on the merits without simultaneously considering irreparable harm.[12] Finding that Nichino would likely succeed on the merits, the District Court properly applied the TMA by presuming irreparable harm and turning its attention to Valent's rebuttal evidence. Here, the District

---

[11] Contrary to Nichino's argument, § 226(b) of the TMA does not fight this reading. A "Rule of Construction," § 226(b) states the Act "shall not be construed to mean that a plaintiff seeking an injunction was not entitled to a presumption of irreparable harm before the date of enactment of this Act." Pub. L. No. 116-260 § 226(b). Read in context, that means a plaintiff is always entitled to the newly codified presumption, even if the infringing conduct predated the TMA. Nichino enjoyed that benefit here.

[12] Nichino contests the District Court's finding that the degree of similarity between the marks favored Valent, but that is not clearly erroneous. The District Court found that the auditory similarity of the marks' pronunciations favored Nichino, while the marks' visual dissimilarities leaned toward Valent. And the Court found appearance more important than sound. All questions of fact best weighed by the District Court, and we have no occasion to disturb that conclusion.

Court again appropriately referenced the *Lapp* factors for consumer confusion, described them as "closely balanced," and found that Valent had rebutted the presumption by producing evidence of a sophisticated consumer class. (App. at 177–80.) A framework that anticipated the steps we provide today.

Nichino is correct that the District Court erred by considering Nichino's failure to produce evidence of actual confusion at this stage, when the sole focus is whether Valent had adduced affirmative evidence that irreparable harm is unlikely. As explained, the TMA shifted the burden of production to Valent when Nichino showed likely success. And Valent cannot meet that production burden simply by pointing to Nichino's lack of evidence. Faulting Nichino improperly placed the burden of production on the plaintiff at the rebuttal stage.

But that slight error does not undermine the District Court's judgment. The Court also credited Valent's evidence that the relevant consumers are sophisticated buyers who exercise great care in purchasing pesticides. Among the facts noted by the Court: 1) the differing prices; 2) the expense of seasonal treatment; 3) regular reliance on expert recommendations; and 4) the consequences of misapplication, including crop destruction and corresponding disastrous economic consequences. All tending to heighten purchasing care, and all making it plausible to conclude that consumers will confirm their pesticide selection before staking their farms on an inadvertent purchase. As the District Court correctly held, this evidence meets the light burden of production that

the TMA's presumption of irreparable harm placed on Valent.[13]

With the presumption rebutted, the burden of evidence production returned to Nichino to show likely irreparable harm absent an injunction. The District Court found that Nichino did not, and Nichino does not argue otherwise. That makes the District Court's conclusion, and its decision to deny injunctive relief, correct, as "[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co.*, 176 F.3d at 153.[14]

---

[13] Nichino is right that "the standard of care [in purchasing] . . . will be equal to that of the least sophisticated consumer in the class," *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 293 (3d Cir. 1991), but that is the standard that the District Court used by focusing on small commercial farmers, not large agribusiness operations. Nor does the sophistication of the farm workers applying the chemicals much matter, because they do not make the purchasing decisions, and we evaluate the sophistication of the "buyer class," not the broader class of all users. *Id.*

[14] While unnecessary to our decision, we see no error in the District Court's balancing of equities. Ample evidence supports the Court's conclusion that an injunction would cause Valent to lose significant sales while it reapplied, and awaited approval, for a new trademark. Those amounts, using Valent's pre-release projections, measured in millions of lost dollars. (*See* **S. App. at 445.**) Nor is there error in the Court's finding that the public interest "is better served by allowing continued access to an innovative product[, SENSTAR,] that can be used against all insect life stages." (App. at 181.)

**III.**

For these reasons, we will affirm the District Court's order denying Nichino's motion for a preliminary injunction.