**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-1197
_____

AMRES CORPORATION,
                                        Appellant

v.

NEXTRES LLC;
MITCHELL AYZENBERG

____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:24-cv-00824)
District Judge: Honorable Kelley B. Hodge
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 13, 2026
_____

Before: MATEY, CHUNG, and AMBRO, *Circuit Judges*

(Filed: February 17, 2026)
_____

OPINION*
_____

---

*This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

MATEY, *Circuit Judge*.

Amres Corporation brought federal trademark and related state-law claims against its spun-off company and one of its prior employees. But neither used Amres's trademark in a manner that was likely to confuse customers, so we will affirm the District Court's order dismissing the case.

## I.

Mark Wilson ("Mark") and Kirk Ayzenberg ("Kirk") co-owned Amres when they decided to reorganize due to the growth of their Wholesale and Non-Qualified Mortgage businesses, which operated under the "Amres Wholesale" and "Ambridge" trade names, respectively. Pursuant to the parties' Redemption Agreement (the "Agreement"), Amres redeemed 50% of its issued outstanding shares from Kirk, giving Mark complete ownership of Amres. In return, Kirk "or his designated business entity" received "the rights to conduct ALL business activities without prejudice or restriction in direct competition to existing [Amres] business activities not limited to" the Amres Wholesale and Ambridge divisions, "but the divisions' names and/or business entities [] remain[ed] under the exclusive control of [Amres]." Supp. App. 33.

Kirk had formed a new mortgage company, Nextres LLC. Following the Agreement's execution, Kirk's brother, Mitchell Ayzenberg ("Mitch"), who was still employed with Amres, "used" an Amres trademark "alongside a Nextres trademark or directly underneath one another in e-mails to Amres' existing and potential customers and industry leaders . . . stating that Amres is changing name [sic] to Nextres or that the two

2

entities were affiliated." App. 21. Amres had used its unregistered mark in commerce prior to the dates of these emails and the Agreement.[1]

Amres later sued Nextres and Mitch ("Defendants"), alleging they "infringe[d] . . . Amres' unregistered Amres Trademark" and "created and maintained a false association between Nextres and Amres through false statements" in violation of 15 U.S.C. § 1125(a)[2] and Pennsylvania trademark law. App. 23–24. Its Complaint also alleges that Mitch breached his fiduciary duty of care and loyalty to Amres.[3] The District Court dismissed the infringement and false association claims because, "[a]side from attaching screenshots of the Amres and Nextres logo[s], [Amres] offer[ed] no facts that establish . . . that the use of the marks would or did create confusion." App. 13. With all federal claims dismissed and without diversity, the Court dismissed the remaining state claims. Amres appealed.[4]

---

[1] Following execution of the Agreement, "Amres applied to the United States Patent and Trademark Office ('USPTO') to register the Amres Trademark." App. 19. Over a year later, the USPTO issued a registered trademark for the Amres mark.

[2] This false association claim was stylized as a false advertising claim in Amres's complaint. Nevertheless, the District Court construed it as a false association claim because it "lies in the allegedly false association between Amres and Nextres, not [in] the characteristics of the good itself." App. 13. Amres does not challenge this characterization on appeal, so we too construe it as a false association claim.

[3] Amres did not attach the Agreement to the Complaint, despite referencing it. On Defendants' motion to dismiss, the District Court held that the Agreement was properly incorporated without conversion of the Rule 12(b)(6) motion into a Rule 56 motion. This conclusion is unchallenged on appeal, so we draw from the Agreement as if it were included in the Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[4] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1367, and we have jurisdiction under 28 U.S.C. § 1291. "We exercise plenary review of the District Court's dismissal," *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018),

## II.

To state a claim for false association under § 1125(a)(1)(A), or trademark infringement,[5] Amres was required to plausibly allege that Defendants' "use of the [Amres] mark[] to identify . . . services [wa]s likely to create confusion concerning the origin of the . . . services." *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 230 (3d Cir. 2017).[6] Likelihood of confusion considers "three categories": 1) "facts about the plaintiff's mark, including its distinctiveness"; 2) "facts about the defendant's actions, including whether the mark was adopted to intentionally compete, overlapping sales and marketing efforts, and how long the competing mark has been in the market without confusion"; and 3) "facts about how consumers deal with both marks." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 183 n.4 (3d Cir. 2022) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463–64 (3d Cir. 1983)). The lodestar of the analysis remains whether "consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a

---

and "may affirm on any basis supported by the record, even if it departs from the District Court's rationale," *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019).

[5] Section 1125(a) "creates 'two distinct bases of liability: false association . . . and false advertising.'" *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 225–26 (3d Cir. 2017) (citation omitted). It does not create liability for trademark infringement, so Amres has failed to properly plead that claim. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 & n.5 (3d Cir. 2001). Regardless, the elements of trademark infringement for an unregistered mark include all the elements of a false association claim. *See id.* at 279; *compare Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991), *with Parks*, 863 F.3d at 230.

[6] Amres was also required to plausibly allege that it owned its mark, and that its mark is "valid and legally protectable." *Parks*, 863 F.3d at 230.

4

similar mark." *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001) (citation omitted); *Nichino*, 44 F.4th at 186 (noting the analysis must be "aimed" at "consumer confusion").

If anything, Amres's complaint, read alongside the Agreement, evinces the opposite of consumer confusion. Amres decided to spin off the Amres Wholesale and Ambridge business lines because "they ha[d] . . . taken on a life of their own," and "reorganization [wa]s the only way . . . to ensure consistent support across the various lines of business." Supp. App. 49. Accordingly, the Agreement gave Kirk the right to "conduct ALL business activities . . . currently . . . operating under" the Amres Wholesale and Ambridge divisions in his new company. Supp. App. 33.

The Agreement also outlined the transition period, starting with the creation of a different trade name. During the transition, the new brand would be "solely owned by [Amres]," but Kirk would operate it "with the benefits of [Amres] licensing." Supp. App. 37. Any Amres employee could "choose[] to work with [Kirk] or his new company" and would be "permitted to continue to work with [Amres] under the [Amres] brand with no restrictions from current abilities . . . up until July 31, 2022." Supp. App. 34. "[B]y July 31, 2022," Amres would "transfer" the new trade name to Kirk so he could "continue to operate under the brand . . . at his new entity." Supp. App. 37.

The Complaint appends only emails that *clarify* to customers the nature of this intricate spin-off and transition period. Certain emails, from Mitch or other Amres personnel, explicitly tell customers "[w]e are changing names to Nextres Commercial to clear any confusion you may have." *E.g.*, App. 31, 33, 35. Other emails make the

reasoning even clearer: because "[w]e are currently in a transition phase to change our name from Amres Corporation to Nextres Corporation." App. 38; *see also* App. 41. All emails were sent during this "transition phase" to either Amres Wholesale or Ambridge customers or prospects. They simply show employees effectuating the foregoing provisions of the Agreement, as the Complaint presupposes that Nextres was the envisioned spin-off entity. And while the employees' statements that Amres had 'changed names' may have been incorrect, these simplifications could not have caused customers to confuse the "origin of [Nextres's] services," *Parks*, 863 F.3d at 230, because, under the terms of the Agreement, customers were supposed to associate Nextres with Amres.[7]

\* \* \*

For the foregoing reasons, we will affirm the District Court's judgment.

---

[7] Without a federal cause of action, the District Court was entitled to dismiss the remaining state law claims because they were reliant on supplemental jurisdiction, a ruling which we will also affirm. *See* 28 U.S.C. §1367(c)(3).